UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------X

AARON RUBENSTEIN,

                Plaintiff,                16 Civ. 7283

    -against-                       OPINION

LIVE NATION ENTERTAINMENT,

                Nominal Defendant,

    -and-

LIBERTY MEDIA CORP.,

                Defendant.

----------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6|20|17

A P P E A R A N C E S:

        Attorneys for Plaintiff

        MIRIAM TAUBER LAW PLLC
        885 Park Avenue 2A
        New York, NY 10075
        By:  Miriam Tauber, Esq.

        LAW OFFICES OF DAVID LOPEZ
        P.O. Box 323
        171 Edge of Woods Road
        Southampton, NY 11968
        By:  David Lopez, Esq.

        Attorneys for Defendant
        Liberty Media Corp.

        BAKER BOTTS LLP
        30 Rockefeller Plaza
        New York, NY 10112
        By:  Douglas W. Henkin, Esq.
             Richard B. Harper, Esq.

2001 Ross Avenue, Suite 600
Dallas, Texas 75201-2980
By:    Thomas E. O'Brien

98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
By:  Mysha Lubke, Esq.

Attorneys for Nominal Defendant
Live Nation Entertainment

LATHAM & WATKINS, LLP
140 Scott Drive
Menlo Park, CA 94025
By:  Hilary H. Mattis
     Robert A. Koenig, Esq.

885 Third Avenue
New York, NY 10022
By:  Jason C. Hegt, Esq.

**Sweet, D.J.**

Defendant Liberty Media Corporation ("Liberty" or the "Defendant") has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint of plaintiff Aaron Rubenstein ("Rubenstein" or the "Plaintiff") (the "Complaint") seeking recovery for short swing profits under Section 16(b) of the Securities Exchange Act of 1934. Upon the conclusions set forth below, the motion is granted and the complaint against Liberty and the nominal defendant Live Nation Entertainment ("Live Nation") is dismissed.

**I.  Facts**

The facts as set forth in the Complaint are not disputed unless otherwise noted.

Live Nation is a publicly held company, with common stock registered under Section 12(b) of the Act. Compl. ¶ 6, 10. Rubenstein is a shareholder of Live Nation. *Id.* ¶ 7. Liberty, a corporation, is a more than 10% owner of Live Nation. *Id.* ¶ 11.

On September 4, 2014, Liberty entered into a forward purchase contract (the "Forward Contract") with an unaffiliated

1

bank counterparty (the "Bank"). *Id.* ¶ 15. The relevant terms of the contract were summarized in a Form 4s that Liberty filed with the SEC. Mot. to Dismiss, Ex. A (Liberty's September 30, 2015 Form 4 – Statement of Changes in Beneficial Ownership); Ex. B (Liberty's December 1, 2015 Form 4 – Statement of Changes in Beneficial Ownership).

Under the terms of the Forward Contract, Liberty agreed to purchase from the Bank on the settlement date the number of shares purchased by the Bank during its "initial hedging period" – capped at 15.9 million shares – at a "forward price" to be determined at the conclusion of the initial hedging period in accordance with a formula set forth in the Forward Contract. Compl. ¶ 15. The initial hedging period concluded on September 28, 2015, and the Forward Contract settlement date was November 27, 2015. Mot. to Dismiss, Ex. A.

The final number of shares covered by the Forward Contract was 15.9 million shares, and the final forward price was $24.9345 per share. Mot. to Dismiss, Ex. B. The Forward Contract was physically settled on December 2, 2015. *Id.*

## II. Prior Proceedings

On September 19, 2016, Plaintiff filed the Complaint, alleging that, pursuant to the Forward Contract, Liberty profited from the purchase and sale of Live Nation securities within a period of less than six months. Compl. ¶¶ 1-4. The instant motion to dismiss the Complaint was heard and marked fully submitted on February 23, 2017.

## III. The Applicable Standard

The Rule 12(b)(6) standard requires that a complaint plead sufficient facts to state a claim upon which relief can be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). A court need not accept as true, however, "[l]egal conclusions, deductions or opinions couched as factual allegations." *In re*

3

*NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).
"[A] plaintiff's obligation to provide the grounds of his
entitlement to relief requires more than labels and
conclusions." *Twombly*, 550 U.S. at 555 (quotation marks
omitted). A complaint must contain "sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S.
at 570).

A claim is facially plausible when "the plaintiff
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). In
other words, the factual allegations must "possess enough heft
to show that the pleader is entitled to relief." *Twombly*, 550
U.S. at 557 (internal quotation marks omitted). In determining
the sufficiency of a complaint, the Court may consider "the
factual allegations in [the] . . . complaint, . . . documents
attached to the complaint as an exhibit or incorporated in it by
reference, [] matters of which judicial notice may be taken,
[and] documents . . . which the plaintiff[] . . . relied on in
bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142,
150 (2d Cir. 1993); *see also Chambers v. Time Warner, Inc.*, 282

F.3d 147, 153 (2d Cir. 2002) ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.") (emphasis in original); *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (an extraneous document is not incorporated by reference into the complaint where "[t]he amended complaint merely discussed these documents and presented short quotations from them").

Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Munoz-Nagel v. Guess, Inc.*, No. 12-1312, 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)) and *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); *see also Williams v. Calderoni*, No. 11-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555

(quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216 (3d ed. 2004)).

## IV. Section 16(b) Liability Has Not Been Established

Section 16 of the Securities Exchange Act, 15 U.S.C. § 78p (the "Act"), imposes certain obligations on officers, directors, and beneficial owners of more than 10% of a class of equity security registered under Section 12 of the Act relating to their trading in the securities of the issuer. *See* 5 U.S.C. § 78p; *see also Roth v. Goldman Sachs Grp. Inc.*, 873 F. Supp. 2d 524, 529 (S.D.N.Y. 2012). Section 16(a) mandates that such statutory "insiders" must report to the Securities and Exchange Commission (SEC) the amounts of all equity securities beneficially owned, and must timely disclose any changes in such ownership. 15 U.S.C. § 78p(a).

Section 16(b) polices trading of securities by insiders. It "seeks to deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they

trade." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998). In relevant part, it provides:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . .

> 15 U.S.C. § 78p(b).

Section 16(b) is a strict liability statute, a "flat rule" requiring insiders to disgorge profits from any purchase and sale of company securities within a six-month period. *See Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 176 (2d Cir. 2012) (using language from *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972)); *see also Roth v. Solus Altern. Asset Mgmt. LP*, 124 F. Supp. 3d 315, 317 (S.D.N.Y. 2015). Under Section 16(b), "there is, in effect, a conclusive presumption that the insider traded on the basis of inside information when conducting a short-swing transaction. . . . [I]ssues of scienter, materiality, reliance and causation . . . are irrelevant." Peter L. Romeo and Alan L. Dye, Section 16

Treatise and Reporting Guide (4th ed. 2012) ("Romeo & Dye") §
9.01[b].

Therefore, the test for liability under Section 16(b)
has no scienter component. Instead, the plaintiff must prove
"that there was (1) a purchase and (2) a sale of securities (3)
by an [insider] (4) within a six-month period." *Chechele v.
Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky*,
156 F.3d at 308).

It is undisputed that Liberty, as a beneficial owner
of more than 10% of Live Nation equity, was a statutory
"insider" for purposes of Section 16(b). *See* Mot. to Dismiss at
5-6 (setting out the *Gwozdzinsky* test for Section 16(b) and not
contesting the "insider" prong). The issues remaining are
whether there was a purchase and a sale of securities by Liberty
within a six-month period.

According to Plaintiff, on September 28, 2015 (when
the initial hedging period ended), the Forward Contract
established a "call equivalent" derivative position because on
that date, the number of shares and the purchase price became
fixed. Compl. ¶¶ 16-18. Plaintiff alleges that the "call

equivalent" derivative position consisted of two distinct derivative positions: (1) a long call option position, representing Liberty's right to purchase, or "call", up to 15.9 million Live Nation shares, and (2) a short put option position, representing Liberty's obligation to purchase those shares (and the Bank's corresponding right to sell, or "put", the shares to Liberty). *Id.* ¶¶ 2, 19. Plaintiff also alleges that long and short positions simultaneously closed when the Forward Contract expired on November 27, 2015, the call option having been exercised and the put having expired unexercised because the settlement resulted in an effective payout to Liberty. *Id.* ¶¶ 4, 23-26.

Plaintiff argues that the expiration of the short option component to Liberty's call equivalent derivative position on November 27, 2015 constitutes a nonexempt Section 16(b) transaction that can be matched with its establishment on September 28, 2015, giving rise to short swing profits under SEC Rule 16b-6(d). *Id.* ¶ 25.

According to Liberty, the contract at issue was a standard forward contract, entered into on September 4, 2014 and settled more than one year later, for the purchase of Live

Nation shares that resulted in an actual purchase of those shares and did not establish two distinct derivative positions for Liberty. In addition, Liberty argues that any hypothetical put option did not expire unexercised or within six months of its writing, Liberty did not recognize any profit, and there was no opportunity for speculative abuse.

### a. The Within Six Months Requirement Has not Been Met

Although courts have analyzed Forward Contracts under Section 16(b), none has held an insider liable under the statute for settling a Forward Contract more than six months after entering into it. In each case, the court granted the defendant's motion to dismiss because, as a matter of law, the transactions did not constitute both a purchase and sale of securities within less than six months, as required by Section 16(b).

In *Chechele v. Sperling*, two insiders entered into five "prepaid variable forward contracts" through which the insiders agreed to sell up to a specified maximum number of shares of their company's stock to an unaffiliated bank counterparty. 758 F.3d at 465-66. The forward contracts were

"variable" because the ultimate number of shares the insiders would sell, and the ultimate price the insiders would receive for the shares, varied depending on the market price of the shares on the maturity dates. *Id.* at 465. The forward contracts were "prepaid" because the insiders received payments at the time the forward contracts were signed, even though they had pledged the maximum number of shares to the bank counterparty without transferring title. *Id.* Years after entering into the forward contracts, the parties settled the contracts in accordance with the contractual formulas. *Id.* at 466-67. In each case, the insider delivered less than the maximum number of shares pledged to the bank counterparty, with the remaining pledged shares returned to the insider. *Id.* The plaintiff argued that the settlement of each forward contract resulted in a Section 16(b) purchase of the returned shares that could be matched with open-market sales of shares by the insider during the six months before or after the settlement date of the contract. *Id.* at 467.

Rejecting this argument, the district court granted the insiders' motion to dismiss for failure to state a Section 16(b) claim. *Chechele v. Sperling*, No. 11 Civ. 0146, 2012 WL 1038653 (S.D.N.Y. Mar. 29, 2012). The district court concluded

that because the insiders' rights became "fixed and irrevocable" at the time they entered into the prepaid variable forward contracts, "the repurchases of the [insiders'] retained shares on the settlement date did not constitute a 'purchase' under [s]ection 16(b)." *Id.* at *5. The Second Circuit affirmed. *Sperling*, 758 F.3d at 465.

*Donoghue v. Patterson Companies, Inc.* involved the same type of forward contract and a Section 16(b) claim, centering on the issue of whether returned shares constituted a purchase under Section 16(b). 990 F. Supp. 2d 421, 423-24 (S.D.N.Y. 2013). Like the court in *Sperling*, the court in *Patterson Companies* granted the insider's motion to dismiss for failure to state a claim under Section 16(b). *Id.* at 425-27. The court held that "the transaction [was] exempt from Section 16(b) liability at settlement [because] the insider [was] irrevocably obligated to settle [the] transaction at a certain date and have the price calculated by a pre-set formula." *Id.* at 426.

*Donoghue v. Murdock* also involved a variable forward contract and the court also granted the defendants' motion to dismiss. No. 13 CIV. 1224 PAE, 2013 WL 4007565, at *1 (S.D.N.Y. Aug. 6, 2013). The plaintiff argued that the insider's decision

to turn over shares on the settlement date constituted a Section 16(b) sale that could be matched with purchases of shares made by the insider outside of the forward contract within six months of the settlement date of the contract. *Id.* The court held that the insider's sale of stock occurred, for section 16(b) purposes, on the date the insider entered into the forward contract because "[the insider's] obligations were fixed and irrevocable" as of that date. *Id. at* *9.

*Donoghue v. Centillium Communications, Inc.* involved facts and allegations similar to those in *Murdock*. No. 05 CIV.4082(WHP), 2006 WL 775122, at *1 (S.D.N.Y. Mar. 28, 2006). The plaintiff alleged that the insider's transfer of all pledged shares at the settlement of the Forward Contract constituted a Section 16(b) sale. *Id.* at *4. The court dismissed the complaint, concluding that the relevant transaction took place at the inception of the forward contract – more than three years earlier – and that any opportunity to manipulate the transaction based on inside information was present only at the contract's inception. *Id.* at *5.

The unifying principle in these cases is that where an insider has had "no opportunity to speculate on the basis of

[his] inside information," Section 16(b) has not been violated. *Sperling*, 2012 WL 1038653, at *5, *aff'd*, 758 F.3d 463 (2d Cir. 2014); *see also* Senate Comm. on Banking & Currency, Stock Exchange Practices, S.Rep. No. 1455, 73d Cong., 2d Sess. at 68 (1934) (Section 16 was enacted to prevent corporate insiders from using non-public information to "speculate in the stock of the corporations to which they owe a fiduciary duty").

Here, Liberty entered into the Forward Contract with the Bank on September 4, 2014, and the contract settled more than a year later, on September 28, 2015. The Forward Contract is the same type of derivative analyzed in *Sperling*,[1] and the Second Circuit's holding in that case applies: If the quantity and price of the shares subject to a forward are determined by formulas in the contract, the "purchase" or "sale" is deemed to have occurred for Section 16(b) purposes when the contract was executed, not when the final quantity and price become known. *See Sperling*, 758 F.3d at 465–66. Because Liberty was irrevocably obligated to settle the transaction on a date more

---

[1] Although the prior cases discussed above involved insiders who sold — rather than purchased — stock of their companies via a variable forward contract, this is merely a reversal of the insiders' roles with those of the bank counterparties and does not require a different analysis or result.

14

than six months after entering into the transaction, and at a price determined by a formula in the contract, Liberty had no opportunity to speculate on the basis of its insider information, and Liberty's transaction is exempt from Section 16(b) liability.

The Plaintiff construes Liberty's Forward Contract as two option positions, in a similar argument to the one that was rejected in *Sperling*. Plaintiff contends that the two option positions were established on September 28, 2015 and expired on November 27, 2015; Liberty's transaction falls within the six-month window, according to Plaintiff, because the price was "first fixed" on September 28, 2015 and the physical settlement occurred 60 days later. Resp. Br. at 13; Compl. ¶ 25. This characterization of the Forward Contract is incorrect in light of *Sperling*. "The transactions to be matched [in a case involving a forward like this one] are not the 'fixing' of the price shortly before settlement and the settlement itself, but the writing of the contract and the settlement." *Id.* at 471. Even if "the number of shares that may be [purchased] and the price of those shares is not known at the time [a forward] contract is written," if "the price [is] set by a predetermined

formula," there is "no opportunity for additional manipulation after the contract is signed." *Id.* at 470.

Suggesting that the collar features of the *Sperling* prepaid variable forward contracts distinguish them from Liberty's Forward Contract in determining which transactions to match, Plaintiff claims that each forward contract in *Sperling* provided an initial fixed price range (i.e., a collar) that was subsequently adjusted based on events outside the insider's control, whereas the sole price term in Liberty's contract was a floating formula to be determined based on events inherently unknown to the parties at the time of execution. Resp. Br. at 11. What the Second Circuit relied on for its transaction-matching holding in *Sperling* was not the inclusion of collars in the forward contracts, but rather the inclusion of pricing formulae in those contracts; the court stated that "[b]ecause the parties are bound to the formula and dates from the time of contracting, the prices of these [prepaid variable forward contract] options were fixed at the time they entered the contract even if they are not known." *Id.* Here, too, the forward price was fixed by formula when Liberty entered into the forward even though it was not known what the price would turn out to be as a dollar figure.

Even assuming Liberty had established both a long call option position and a short put option position on September 28, 2015, it would not be liable under Section 16(b) because both positions would have been exercised more than six months after their establishment on September 4, 2014. As a matter of law, the exercise of a derivative security is exempt from Section 16(b), and transactions falling outside the six-month window are not subject to Section 16(b) liability.

Further, Plaintiff's claim that the Forward Contract established two options - a call option for Liberty and a put option for the Bank - cannot create Section 16(b) liability. If Liberty had a call option and the Bank had a put option, then both options had the same strike price and both parties exercised their options on the settlement date, with Liberty as purchaser and the Bank as seller. Because the hypothetical options had the same strike price and Liberty paid that price in return for the Live Nation shares, there is no basis to hold that one option was exercised but not the other. If one was exercised then so was the other, and vice-versa, which would have resulted in an exempt acquisition by Liberty under SEC Rule 16b-6(b). Plaintiff cannot construct hypothetical option positions and then choose which one was exercised to try to

17

create Section 16(b) liability where none would otherwise exist. The Bank's hypothetical exercise of its hypothetical put option is a "non-event" as a matter of law. *Sperling*, 758 F.3d at 469 (quotations omitted). Because the Bank's hypothetical put option would not have expired unexercised, it cannot be matched with Liberty's alleged writing of that option to create liability under section 16(b).

Under the reasoning and holding set forth in *Sperling*, the within six months requirement of Section 16(b) is not met and no liability can attach.

**b.** **No Profit Has Been Realized**

The Plaintiff has conceded that Liberty has not sold any Live Nation stock purchased in the challenged transaction. Plaintiff acknowledges that only way a Section 16(b) claim can be sustained here is by viewing the Forward Contract as a hypothetical call option and a hypothetical put option, established on September 28, 2015. As set forth above, *Sperling* does not comport with this view of the Forward Contract.

Courts have cautioned against recasting an actual transaction into something a plaintiff hypothesizes it could have been in order to create liability under Section 16(b). See *Olagues v. Icahn*, No. 1:15-CV-0898-GHW, 2016 WL 1178777, at *11 (S.D.N.Y. Mar. 23, 2016), *appeal pending*, No. 16-1255 (2d Cir.) ("As outlined above, Plaintiff's theory rests on the fragmentation of Defendants' transaction into two hypothetical separate transactions, and the subsequent revaluation of those component parts. That is unsteady ground. Courts have long cautioned against 'recast[ing] the actual transaction into [plaintiff's] hypothetical one in order to create liability under § 16(b).'") (quoting *Portnoy v. Memorex Corp.*, 667 F.2d 1281, 1283 (9th Cir. 1982)). In particular, courts have rejected plaintiffs' attempts "to fragmentize" transactions into hypothetical component parts to try to establish section 16(b) liability where it would not otherwise exist. *See Schur v. Salzman*, 365 F. Supp. 725, 730 (S.D.N.Y 1973).

Plaintiff claims that "Liberty is strictly liable for the maximum recoverable 'premium received for writing the option' . . . , unless Liberty demonstrates lesser actual 'profits realized.'" Resp. Br. at 20. Plaintiff then calculates Liberty's purported actual profits as described above – "the

excess value of the 15.9 million shares Liberty received on the settlement date, over the fixed purchase price Liberty paid for the shares," equaling $4,062,450. Resp. Br. at 21. Plaintiff has cited no authority for this interpretation of "profit" in Section 16(b) or SEC rules and there is contrary authority.[2]

Plaintiff's contention that Liberty profited from the transaction is not supported by SEC Rule 16b-6(d), the rule relied on by Plaintiff to allege that Liberty is liable under Section 16(b). Rule 16b-6(d) provides:

> Upon . . . expiration of an option within six months of the writing of the option, any profit derived from writing the option [is] recoverable under section 16(b). The profit shall not exceed the premium received for writing the option.
>
> 17 C.F.R. § 240.16b-6(d).

Rule 16b-6(d) "is designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a put option, and receives a premium for doing so,

---

[2] *S & S Realty Corp. v. Kleer-Vu Indus., Inc.*, 575 F.2d 1040, 1043-44 (2d Cir. 1978) ("[P]rofit [is] an excess of returns over expenditures in a transaction or series of transactions.") (quotations and citations omitted)); *Heli-Coil Corp. v. Webster*, 352 F.2d 156, 167 (3d Cir. 1965) (profit is "the excess of the price received over the price paid for goods sold"); *Olagues*, 2016 WL 1178777, at *13 ("profit" is the "excess of revenues over expenditures in a business transaction" (quotations and citations omitted)).

knowing, by virtue of his inside information, that the option will not be exercised within six months." *Gwozdzinsky*, 156 F.3d at 309. Under the plain language and purpose of Rule 16b-6(d), where an insider receives no premium for writing an alleged option, there is no profit to be disgorged.

There is only one measure of profits under Rule 16b-6(d) recognized in the case law: The amount of the premium the purchaser of the option paid the insider for the option. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 252 (2d Cir. 2006) ("[I]f an insider writes an option that expires unexercised within six months . . . , the writer will be held liable under section 16(b) for the amount the purchaser paid him or her for the option."). Here, that amount is zero even under Plaintiff's view of the Forward Contract as establishing two options.

Plaintiff also contends that Liberty is liable for the "premium received for writing the [alleged] option," which Plaintiff claims is equal to "the value of the consideration Liberty received from the Bank in exchange for the put that Liberty sold [the Bank]." Resp. Br. at 21.[3] A "premium" is what

---

[3] Citing the bid and ask prices of exchange-traded Live Nation call options on September 28, 2015, Plaintiff claims that Liberty's purported call option was worth $17,490,000, and,

"the purchaser paid [the option writer] for the option."
*Allaire*, 433 F.3d at 252. Liberty was the buyer, not the seller, in this transaction. The Bank paid nothing to Liberty. Nor was "the sole consideration . . . exchanged by the parties . . . the options that each [purportedly] purchased and sold under the [f]orward." Resp. Br. at 23. In return for the Live Nation shares, Liberty paid the Bank the forward price, which included a commission, the Bank's funding costs, a contractually agreed spread, and interest. Liberty Schedule 13-D, Dkt. #33-1.

In any event, no precedent supports interpreting Rule 16b-6(d) to require an insider to reimburse the "consideration received" for writing an alleged option instead of the "premium received." 17 C.F.R. § 240.16b-6(d). As Plaintiff concedes, the only authority on point is to the contrary. *See Olagues*, 2016 WL 1178777, at *13; Resp. Br. at 22.

thus, Liberty received $17,490,000 in consideration for allegedly selling the bank a put option. Resp. Br. at 21-22. These allegations do not appear in the Complaint. Plaintiff cannot amend his Complaint by asserting new facts or theories for the first time in opposition to Liberty's motion to dismiss. *See K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013).

Finally, Plaintiff's theory freezes the unrealized value on the settlement date, ignoring the fact that if the price of Live Nation stock went down after that day, the unrealized value would disappear. *See Olagues*, 2016 WL 1178777, at \*13. Liberty bought the Live Nation shares for $24.9345 per share. After the physical settlement, Live Nation's stock price dropped. Over the next six months Live Nation's stock price closed above $24.9345 only a few times, dropping as low as $19.36. A hypothetical future sale by Liberty would not necessarily result in a profit to Liberty.

V. **Conclusion**

For the reasons stated above, the Liberty's motion to dismiss is granted. Because it is a nominal defendant, and Liberty's motion to dismiss has been granted, Live Nation's motion to dismiss is granted.

It is so ordered.

New York, NY
June  /9 , 2017

_____
ROBERT W. SWEET
U.S.D.J.